The document below is hereby signed.

Signed: January 20, 2016



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| DIRISU OJO MOMOH, | ) | Case No. 14-00291 |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| VICTOR OSAYANDE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 14-10034 |
| DIRISU OJO MOMOH, | ) | |
| | ) | Not for publication in |
| Defendant. | ) | West's Bankruptcy Reporter. |

<u>MEMORANDUM DECISION</u>

After reflecting further on the evidence, I vacated my prior

oral decision, except with respect to the part of the decision

dealing with a dismissal of the claims for a denial of discharge

under 11 U.S.C. § 727(a).  I now make the following findings of

fact and conclusions of law regarding the plaintiff's claim that

the debt owed him is nondischargeable.  The plaintiff, Victor

Osayande, seeks a determination that the debt owed to him by the

defendant, Dirisu Ojo Momoh, is nondischargeable under 11 U.S.C.

§ 523(a)(2)(A) as a debt for money obtained by "false pretenses, a false representation, or actual fraud, other than a statement regarding the debtor's or an insider's financial condition."

I

The term "actual fraud" and similar terms in § 523(a)(2)(A) are common law terms, and a claim of nondischargeability under that provision based on such misconduct requires that the plaintiff plead and prove the elements necessary under common law. *Field v. Mans*, 516 U.S. 59, 69 (1995). Section 523(a)(2)(A) incorporates "the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." *Field*, 516 U.S. at 70 n.9 (citations omitted). A plaintiff's proof of fraud under § 523(a)(2)(A) requires satisfaction of the elements of common law fraud: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007).[1] Moreover, the following pertains to the common law regarding the tort of fraudulent misrepresentation

---

[1] The District of Columbia law on the tort of actual fraud or fraudulent misrepresentation appears consistent with the dominant consensus of common-law jurisdictions in place when § 523(a)(2) was enacted. *See Kumar v. D.C. Water & Sewer Auth.*, 25 A.3d 9, 15 (D.C. 2011); *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 861 (D.C. 1999) (proximate causation); *Va. Acad. of Clinical Psychologists v. Group Hosp. & Med. Servs., Inc.*, 878 A.2d 1226, 1238 (D.C. 2005) (justifiable reliance).

2

when the misrepresentation concerned the debtor's intent to

perform a contract:

> A promise or contractual commitment may be actionable as
> fraud (misrepresentation) if at the time of its making,
> the promisor had no present intention of carrying it out.
> [Citing *Bennett v. Kiggins*, 377 A.2d 57, 60-61 (D.C.
> 1977)); *Day v. Avery*, 548 F.2d 1018, 1026 n.39 (1976);
> Prosser & Keaton on Torts § 109, at 763 (5th ed. 1984).]
> A promissory representation, or a representation as to
> future events asserted in a common law fraud action,
> should only be considered a misrepresentation of fact
> where the evidence shows that the promise was made
> without the intent to perform, or that the promisor had
> knowledge that the events would not occur.  When a person
> positively states that something is to be done or is to
> occur, when he knows the contrary to be true, the
> statement will support an action in fraud.  Prosser
> expands further on the requirement of a present intent
> not to perform when entering a contract to support a
> later action for fraud:

>> Unless the present state of mind is misstated,
>> there is of course no misrepresentation. When
>> a promise is made in good faith, with the
>> expectation of carrying it out, the fact that
>> it subsequently is broken gives rise to no
>> cause of action, either for deceit, or for
>> equitable relief. Otherwise any breach of
>> contract would call for such a remedy. The
>> mere breach of a promise is never enough in
>> itself to establish the fraudulent intent. It
>> may, however, be inferred from the
>> circumstances, such as the defendant's
>> insolvency or other reason to know that he
>> cannot pay, or his repudiation of the promise
>> soon after it is made, with no intervening
>> change in the situation, or his failure even
>> to attempt any performance, or his continued
>> assurances after it is clear that he will not
>> do so.

> § 109 at 764-65 (footnotes omitted).

*Va. Acad. of Clinical Psychologists v. Group Hosp. & Med. Servs.,*

*Inc.*, 878 A.2d 1226, 1234-35 (D.C. 2005).

3

The burden of proof is on a plaintiff to establish by a preponderance of the evidence the elements of nondischargeability under § 523(a)(2)(A). *Grogan v. Garner*, 498 U.S. 279 (1991).

## II

Here, Momoh swindled Osayande by persuading him to give Momoh money in exchange for a promise of repayment, when Momoh had no intention of repaying Osayande, falsely representing that Momoh intended to buy cars at auction and then resell them at a profit, with a handsome repayment to be made to Osayande.  Momoh had no intention of making any payment to Osayande.  The debt owed pursuant to the loans is nondischargeable for the following reasons.

On April 16, 2011, Osayande gave Momoh $6,500, and the parties entered into a notarized agreement reciting:

> I, Victor Osayande invested the sum of . . .  $6,500 . . . in the business of Dirisu Momoh Auto Sales, Inc. in the District of Columbia, in the USA and to get a profit of . . . $1,625 . . . every two months for a period of one year but not less than a period of four months.  The contract can be extended or dissolved after one year. The principal and interest money can be collected by Victor Osayande or his relative in USA or in Nigeria.

On July 23, 2011, Osayande gave Momoh another $6,500, and the parties entered into a second agreement reciting:

> I, Victor Osayande invested the sum of . . .  $6,500 . . . in the business of Dirisu Momoh Auto Sales, Inc. in the District of Columbia, in the USA and to get a profit of . . . $1,625 . . . every two months for a period of one year and not less than a period of four months. . . . The contract can be extended or dissolved after one year. The principal and interest money can be collected by

4

Victor Osayande from his wife in Nigeria or from Mr.
Dirisu Ojo Momoh.

   *    *    *

I can collect the profit or the principal (whole
investment amount) of . . . $6,500 . . . or the contract
can be extended for 1 year if I decide to.  This can be
collected from Mr. Dirisu's wife, Mrs. Bunmi Momoh, who
resides at 13 Adewunmi Street, Obanikoro, Ikorodu Road,
Lagos, Nigeria, phone #080 33123453.

The first investment of . . . $6,500 . . . of April 16,
2011 can be collected any day after August 16, 2011 if I
decide to.  But the second investment of July 23, 2011,
the profit can be collected on September 24, 2011, the
amount of [$1,625].  The whole amount of . . . $6,500 .
. . can be collected four months from today or can be
extended for another 1 year.

In determining whether Momoh swindled Osayande, it is
important at the outset to note which party's testimony was
credible.  Before the agreements were entered into, Momoh
represented to Osayande that he had a company, Dirisu Momoh Auto
Sales, Inc., that engaged in car sales (a completely false
representation), and that if Osayande advanced him funds, then
through such car sales Momoh would be able to earn a profit in
which Osayande could share.  The representation was made to Momoh
with the intent to deceive him into believing that Momoh was in
the business of buying cars at auction and re-selling the cars.
The parties' two loan contracts recited "Dirisu Momoh Auto Sales,
Inc."  Momoh's testimony that Osayande insisted on that reference
appearing in the contracts is totally incredible, a whopping lie.
It is absurd to think that Osayande was the source of the
reference in the parties' contracts to "Dirisu Momoh Auto Sales,

Inc." In that light, Momoh cannot be considered a credible witness with respect to other crucial aspects of his testimony. Moreover, as will be seen, some of that other testimony was incredible on its face. On the other hand, Osayande was entirely credible.

Momoh had assisted a Nigerian company, Adelakay International Limited, that purchased cars at auctions conducted by Insurance Auto Auction (IAA) here in the United States for the restricted purpose of that company's shipping those cars to Nigeria for re-sale, as is confirmed by a letter from Chief Adeola Kayode Olaleye, the company's managing director. When Olaleye was here in the United States, Momoh (who is a taxi driver) drove him to auctions to enable Olaleye to buy cars in the name of Adelakay International Limited.

When Olaleye was not here, Momoh was apparently authorized to buy cars at IAA auctions on behalf of Adelakay International Limited. However, Momoh had no authority to buy cars at IAA auctions in his own name. Momoh's own testimony makes clear that he was only Olaleye's underling, with authority only to buy cars for Adelakay International Limited. There is nothing to suggest that Olaleye was agreeable to Adelakay International Limited being used as a vehicle for Momoh's buying cars that would then be shipped to Nigeria and sold by Adelakay International Limited on behalf of Momoh for Momoh to realize a profit. Although Momoh produced the letter from Olaleye confirming that Momoh was

6

authorized to buy cars for Adelakay International Limited, he produced no e-mails or other correspondence to show that Adelakay International Limited was willing to let Momoh buy cars in Adelakay International Limited's name but with the proceeds of re-selling those cars to be for the benefit of Momoh.  There is no credible evidence that such an arrangement existed (through which, in turn, Momoh would be able to pay Osayande pursuant to the terms of the parties' two contracts).  If Momoh had an arrangement with Adelakay International Limited pursuant to which he could cause cars to be bought in the name of Adelakay International Limited with the proceeds of the re-sale of such cars in Nigeria to be treated as belonging to him, there would have been no reason for him to have misrepresented that he had a company named Dirisu Momoh Auto Sales, Inc.  If such an arrangement *had* existed, he would have simply disclosed to Osayande *that* arrangement.  No such arrangement existed.  The representations to Osayande that Momoh would re-sell cars bought at the auctions was false, as was his statement that he would pay Osayande under the terms of the two contracts.  Instead, Momoh represented to Osayande an ability to re-sell cars to realize a profit when he had no such ability.

Momoh produced copies of the front of two titles certificates and testified that they evinced car purchases he made at auction with the missing reverse sides reflecting that title was signed over to Adelakay International Limited by the

7

respective sellers.  He says these purchases were for the benefit
of Osayande (*i.e.*, that proceeds of resale would come to Momoh
and he would use them to pay Osayande), but there is nothing to
corroborate his testimony in that regard.

Before the parties entered into their agreement, Momoh took
Osayande to an IAA auction, thus lending credence, from
Osayande's perspective, to Momoh's representation that he could
buy cars at auction for resale.  A proximate cause of Osayande's
loss was Osayande's reliance on Momoh's representation that he
had the ability to buy cars at auction that he could resell.
When Osayande went with Momoh to the auction, Momoh gulled
Osayande in believing that this demonstrated that, indeed, he did
have the ability to attend such auctions and buy cars that he
could then resell.  Momoh was able to buy cars at auction (in the
name of Adelakay International Limited, and to ship those cars to
Nigeria for that company to re-sell for that company's benefit),
but beyond that the representations were false, and Momoh knew
they were false.

If Momoh is to be believed, name tag stickers were issued to
Momoh and Osayande at the auction that listed Adelakay
International Limited as the entity through which entrance to the
auction was being gained.  I credit Osayande's testimony that he
did not notice information on any stickers listing "Adelakay
International Limited" as the company pursuant to which entrance
to the auction was gained.  Even if stickers were issued listing

Adelakay International Limited as the entity through which
entrance to the auction was being gained, and Osayande had
noticed that, Osayande (as evidenced by the contracts and by his
filings in this court) is not sophisticated, and he lacked the
acumen to know that he should inquire in that regard.  He relied
on Momoh's representations, and was not sophisticated enough to
know to ask how proceeds could be realized by Momoh if it was
under the aegis of Adelakay International Limited that Momoh was
able to attend the auctions.  Remember, under § 523(a)(A),
reasonable reliance is not required; only justifiable reliance is
required.  As explained in *Field*, 516 U.S. at 71-72, regarding
the justifiable reliance requirement:

> "[i]t is only where, under the circumstances, the facts
> should be apparent to one of his knowledge and
> intelligence from a cursory glance, or he has discovered
> something which should serve as a warning that he is
> being deceived, that he is required to make an
> investigation of his own." W. Prosser, Law of Torts
> § 108, p. 718 (4th ed.1971); (footnotes omitted); accord,
> W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and
> Keeton on Law of Torts § 108, p. 752 (5th ed. 1984)
> (Prosser & Keeton).  Prosser represents common-law
> authority as rejecting the reasonable person standard
> here, stating that "the matter seems to turn upon an
> individual standard of the plaintiff's own capacity and
> the knowledge which he has, or which may fairly be
> charged against him from the facts within his observation
> in the light of his individual case." Prosser, *supra*,
> § 108, at 717; accord, Prosser & Keeton, § 108, at 751;
> see also 1 F. Harper & F. James, Law of Torts § 7.12, pp.
> 581-583 (1956) (rejecting reasonableness standard in
> misrepresentation cases in favor of justifiability and
> stating that "by the distinct tendency of modern cases,
> the plaintiff is entitled to rely upon representations of
> fact of such a character as to require some kind of
> investigation or examination on his part to discover
> their falsity, and a defendant who has been guilty of

9

> conscious misrepresentation can not offer as a defense
> the plaintiff's failure to make the investigation or
> examination to verify the same") (footnote omitted);
> accord, 2 F. Harper, F. James, & O. Gray, Law of Torts
> § 7.12, pp. 455-458 (2d ed. 1986).

Osayande was being shown that Momoh could attend auctions and buy

cars at such auctions, confirming his prior representation that

he bought cars at auction for re-sale.  Even if Osayande had

noticed the company name on the stickers, he was not

sophisticated enough to view this as a red flag warning him to

inquire further.  Osayande was exceedingly gullible, and as *Field*

notes, a plaintiff's lack of sophistication is important in

determining whether reliance was reliable.  As the Court noted in

that decision, "[i]t is only where, under the circumstances, the

facts should be apparent to one of his knowledge and intelligence

from a cursory glance, or he has discovered something which

should serve as a warning that he is being deceived, that he is

required to make an investigation of his own."  *Field*, 516 U.S.

at 71.  The issue turns on "an individual standard of the

plaintiff's own capacity and the knowledge which he has, or which

may fairly be charged against him from the facts within his

observation in the light of his individual case."  *Field*, 516

U.S. at 72.  As the Court in *Field* noted:

> Justifiability is not without some limits, however.  As
> a comment to § 541 [of the Restatement of Torts (Second)
> (1976)] explains, a person is
>
> > required to use his senses, and cannot recover
> > if he blindly relies upon a misrepresentation

the falsity of which would be patent to him if
he had utilized his opportunity to make a
cursory examination or investigation. Thus, if
one induces another to buy a horse by
representing it to be sound, the purchaser
cannot recover even though the horse has but
one eye, if the horse is shown to the
purchaser before he buys it and the slightest
inspection would have disclosed the defect. On
the other hand, **the rule stated in this
Section applies only when the recipient of the
misrepresentation is capable of appreciating
its falsity at the time by the use of his
senses.** Thus a defect that any experienced
horseman would at once recognize at first
glance may not be patent to a person who has
had no experience with horses. *Id.*, § 541,
Comment a.

**A missing eye in a "sound" horse is one thing; long teeth
in a "young" one, perhaps, another.**

516 U.S. at 71 (emphasis added).  The information on the

stickers, if it existed and was noticed by Osayande, was

equivalent to a horse having long teeth when it is represented to

be a young horse.

I expressed concern previously that it did not make sense

that Osayande would have lent $6,500 a second time without having

received the payment that had come due on the first loan of

$6,500.  However, I neglected to take into account his

explanation that Momoh had given him assurances that there was

only a momentary bump in the road (problems Momoh was having

relating to his children), and I neglected to take into account

that the payment was only a month late.  Under the *Field* test of

justifiability, Osayande engaged in justifiable reliance on

Momoh's representations that he could buy cars at auction and re-sell them and that he intended to repay Osayande.

Indeed, Momoh's testimony itself adds credence to the fact that the first alleged payment was *not* made.  Momoh says he made the first payment that came due in cash and asked for a receipt but Osayande refused.  That is not credible.  Momoh had the power to insist on a receipt by refusing payment without receipt or could have utilized a cashier's check to assure that he had a paper trail showing payment.  Accordingly, I now find that the first payment was *not* made to Osayande.  Nor do I credit Momoh's testimony that he made a second payment in cash, asking for a receipt with Momoh refusing to give a receipt for the same reasons.

Momoh's counsel argued that the contracts included repayment terms that were too good to be true.  Irregardless, Osayande was so gullible that he fell for the representation that the handsome repayment terms would be met.  If anything, the sky-high repayment terms cut against Momoh.  The terms were so favorable to Osayande that it is doubtful that Momoh would have entered into the contracts but as a way of swindling Osayande by persuading Osayande to give him the $13,000.

Finally, I reject Momoh's testimony that he made payments via Western Union.  Momoh testified that he paid $759 and $734 to Osayande by way of two Western Union payments on September 26, 2011, and was able to obtain a letter from Western Union

12

reciting, in relevant part, two such payments to:

```
     Receiver:  VICTOR OSAYANGE [sic]
       Status:  Paid
   Payout City:  SALT LAKE CITY
  Payout State:  UT
```

Osayande's testimony that he had never been to Salt Lake City was entirely credible, and nothing was produced to contradict that testimony other than Momoh's testimony, which is not to be believed.  The payments noted in the letter were to a Victor Osayange, not to Victor Osayande.  Most importantly, there is no evidence that, if such payments were made, it was Osayande who received those payments.  I previously said it was incredible to think that Momoh would lie about having made the Western Union payments, but I think that was error: Momoh's testimony convinces me he is a liar.  I am firmly convinced that if this issue were probed further, *e.g.*, via making a more detailed examination of Western Union records to see who acknowledged receipt of any such payments from Western Union (if they occurred), it would merely confirm that the payments, if they actually were made, were not received by Osayande.

In short, I find by clear and convincing evidence that (1) Momoh made a false representation to Osayande, namely, the false representation that he intended to use funds advanced by Osayande to buy cars at auction and then resell them at a profit, with a handsome repayment to be made to Osayande, and that he intended to make the required payments; (2) Momoh made the

representation knowing fully well that he could not resell cars
and that he did not intend to make any repayment to Osayande; (3)
Momoh made the representation with an intent to deceive; (4)
Osayande justifiably relied upon the representation; and (5)
Momoh's misrepresentation of his ability to resell cars and of
his intent to repay was the proximate cause of Osayande's loss.
The debt for the loss Osayande suffered is therefore
nondischargeable.


                              III

     With no payment having been made, the entire debt is
nondischargeable, not just the $13,000 that Osayande is out of
pocket.  *See Cohen v. de la Cruz*, 523 U.S. 213 (1998)
(nondischargeable debt for money obtained through fraud includes
treble damages imposed by state law).  At trial, Osayande limited
his request for a recovery based on the amount owed under the two
contracts.  He did not request imposition of punitive damages.

     According to the terms of each of the contracts, Osayande
was to receive "$1,625 . . . every two months for a period of one
year but not less than a period of four months."  The second
contract additionally indicated "I can collect the profit or the
principal (whole investment amount) of . . . $6,500 . . . or the
contract can be extended for 1 year if I decide to."  I interpret
the contracts as meaning, first, that in four months (or sooner)
Momoh could repay the $6,500 Osayande gave him with no additional

                              14

charge beyond two payments of "profit" of $1,625 each, and that,
second, if Momoh took more than four months and up to a year to
repay the $6,500, then for every two months he would owe $1,625.
However, the second contract permitted repayment within one year
only if Osayande decided to permit that: if he did not permit
that, he could demand payment of the $6,500 at the four-month
mark.  Osayande's right to collect the full amount at the four-
month mark became academic when Momoh made no payments
whatsoever, whether by the four-month mark or by the one-year
anniversary.  For each of the six two-month periods that ran
within one year of the execution of each contract, Momoh owed
$1,625 or a total of $9,750 on each contract.  At the one-year
anniversary of each contract, Momoh owed the principal of $6,500
plus the promised $9,750 in "profit" for a total of $16,250 on
each contract.  Each contract failed to specify any "profit" or
interest to be paid after the one-year anniversary.  In effect,
the contracts treated the obligations as promissory notes that
matured at the one-year anniversary, with no interest rate being
specified after the one-year mark.

While the second contract recited that the contract "can be
extended or dissolved after one year," there never was an
agreement to extend the contract beyond a year.  Momoh had no
interest in doing so because that would have subjected him to a
continuing obligation to pay $1,625 every two months until the
extension period ended.  Osayande had no apparent interest in

doing so because at that point, when no payments had been made in a timely fashion, he wanted to recover the $6,500 he had advanced (plus the "profit" he was owed).

What interest is owed on the $6,500 advanced under each contract after the one-year anniversary?  In the District of Columbia, when a contract recites a rate of interest until maturity but is silent regarding the rate after maturity, the legal rate applies.  *Holden v. Savings & Trust Co.*, 100 U.S. 72 (1879).  *See also Brewster v. Wakefield*, 63 U.S. 118, 127 (22 How.) (1859); *Richards v. Bippus*, 18 App. D.C. 293, 303 (D.C. Cir. 1901); *Sullivan v. Snell*, 8 D.C. 585 (1 MacArth.) (D.C. 1874).  Under D.C. Code § 28-3302(a), "[t]he rate of interest in the District upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6% per annum."  Accordingly, on the first contract, the debt Momoh owes Osayande is $16,250 as of the one-year anniversary date (April 16, 2012), plus interest after April 16, 2012, on $6,500 at 6% per annum.  On the second contract, the debt Momoh owes Osayande is $16,250 as of the one-year anniversary date (July 23, 2012), plus interest after July 23, 2012, on $6,500 at 6% per annum.

The debt owed on the first contract is calculated as follows.  As of January 20, 2016, a period of 3 years, plus 259 additional days in 2015, plus 20 additional days in the leap year

2016 have run since the first contract matured on April 16, 2012.
The post-maturity interest owed on the first contract is thus the
sum of:

.06 x 3 x $6,500 = $1,170;

.06 x 259/365 x $6,500 = $276.74; and

.06 x 20/366 x $6,500 = $21.31.

This equals $1,468.05.  Added to the $16,250 owed at maturity,
that results in $17,718.05 being owed on the first contract as of
January 20, 2016.  A similar calculation reveals that $17,613.34
is owed on the second contract as of January 20, 2016.
Accordingly, Osayande is entitled to entry of a judgment in the
amount of $35,331.39.

IV

A judgment follows awarding a judgment in favor of Osayande
the amount of $35,331.39 and declaring that the judgement debt is
nondischargeable.

[Signed and dated above.]

Copies to: Recipients of e-notification of filings.

17